ARCHIE ORLECK *vs.* HARRY NEMTZOW.

NOVEMBER 27, 1937.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

Capotosto, J.    This is an action in assumpsit on a promissory note, signed by the defendant as maker, dated De-

cember 2, 1933, in the amount of $1800, payable on demand to the order of Berry Bros., Inc., and by it indorsed in blank. The plaintiff is a holder of the note for collection. The case was tried before a justice of the superior court, sitting with a jury, and a verdict was returned for the plaintiff in the sum of $1920.33, including interest. The defendant's motion for a new trial was denied. The case is before us on the defendant's exceptions to rulings during the trial, to the denial of his motion for a directed verdict, to certain portions of the charge, and to the refusal of the trial justice to grant his motion for a new trial.

The declaration is in two counts; a special count, alleging that "Berry Bros., Inc., by its indorsement ordered the contents of said note to be paid to the plaintiff", and the common counts. To this declaration the defendant filed a plea of the general issue and certain special pleas which, in substance, set up (1) failure of consideration on the part of the payee; (2) fraud by Berry Bros., Inc., in obtaining the note under false promises and representations; (3) collusion between the plaintiff and Berry Bros., Inc. to injure the defendant; (4) the plaintiff not a *bona fide* holder for value or in due course. At the trial in the superior court the defendant was given every opportunity to present any and all these defenses as fully as if the suit was brought directly by Berry Bros., Inc.

The varied defenses set up by the defendant, all based on a general claim of unfair dealing by Berry Bros., Inc., resulted in a voluminous transcript and the introduction of numerous exhibits. We have examined both with care in order to determine whether Berry Bros., Inc. dealt unfairly with the defendant or whether the defendant, by inconsiderate accusation, is attempting to avoid the payment of a just obligation. The following rather detailed statement of facts, which is a summary of our reading of the transcript and of the correspondence between the defendant, of the city

of Newport, in this state, and Berry Bros., Inc., of Boston, Massachusetts, is made necessary by the defendant's exceptions hereafter to be considered by us. For convenience, we shall refer to the Berry Bros., Inc., the real party in interest, as the plaintiff, and to the nominal plaintiff as the plaintiff Orleck. The parties agree that both the note in suit and the agreement upon which it is based are contracts made in Massachusetts.

The defendant has conducted a general grain business in the city of Newport, in this state, since 1919. In the summer of 1932 he decided to expand his business and to add thereto a line of paint on a rather extensive scale. On August 6, 1932, we find him writing a letter of inquiry to the plaintiff in which he says: "We are to open two paint stores where we intend to carry a complete line of paint." The contact thus established resulted in an agreement between the defendant and an agent of the plaintiff, which was confirmed by the plaintiff in its letter to the defendant of October 1, 1932. This letter, in so far as material, reads as follows:

> "We now desire to enumerate the agreement made to you verbally. You are to have the franchise for the sale of our goods in Newport, R. I., Jamestown, Middletown and Portsmouth. You are to be allowed the difference in discount from this date on our shipments to Blondin's Battery & Radio Service; and should this party interfere with you in the sale of our products, we will discontinue further shipments to him upon your request. . . . Transportation charges to be paid on all shipments of 100 lbs. and over. . . .

> "On all newspaper advertising featuring Berry Brothers' products 100%, to be carried out on a 50-50 basis, we to be supplied with copies of the ads and a copy of your bill from the newspaper. . . .

> "Next April any items in our line that do not give you a satisfactory turnover, may be returned in ex-

change for other items. Your initial shipment will carry a dating from March 1, which also will apply to any goods that you may decide to order during October. Our terms, as you know, with the exception of Shellac are Net 60 days, 2% 10th of following month for discount. Your initial shipment, as an example, carrying a March 1 dating will be due for discount April 10, or may be paid net April 30."

Under this agreement the plaintiff stocked the defendant's stores in Newport and in Jamestown to the defendant's apparent satisfaction, as shown in his letter of October 31, 1932, to the plaintiff, wherein he says: "We also wish to express our thanks to you for all the cooperation, assistance and hard work given to us by your salesman. . . . We can assure you that the good work of your representative will not be in vain." The first payment on this account was made by the defendant on May 22, 1933, when in sending a check for $500, he writes: "Intended to send more. But my wife's illness upset my plans. However will try to do more before long." The plaintiff's reply letter of May 25, 1933, shows that the balance then owed by the defendant was $3024.69, with $2632.01 of this amount overdue. On June 5, 1933, the defendant paid $500 more, reducing his overdue balance to $2132.01. We wish to note here that at this time there was no complaint of any kind from the defendant.

In June 1933 the defendant's attitude towards the plaintiff began to change. He excuses his failure to pay on his then long overdue account on two grounds: the national economic depression and his claim that, due to his inexperience, he was overstocked with paint by the plaintiff's salesman in October 1932. There may be some merit to the former ground, but the latter ground is clearly contradicted by his own conduct and statements. In his letter of June 27, 1933, after stating that he had left it to the plaintiff to make up his initial order and that he had more items of paint

"on hand than what we should according to the demand," he says:

> "Therefore we think that it would be the best if you people reduce our stock, then it would be less for you to carry on your books, and it would save us a lot of concern. Newport is very badly hit at the present, Business is terrible, money is tight . . . . Make arrangements to take back our access paint and varnish, which it will be a relief to both concerned."

On July 1, 1933, he writes:

> "If things would be normal, or at least as it was last summer, it (referring to his account) would be taken care to the minute and to the cent. . . . You gave us some merchandise which will not sell for a long time to come. There is no demand for it, and some merchandise which is enough for two years supply for a new store. . . . However, I can assure you that you are not going to lose one dollar."

We pause at this point to make a few observations of our own. The tenor of these two letters is not that of an experienced businessman upon realizing that he had been subjected to some unfair practice. If there was no demand for paint in Newport, it was probably due to general economic conditions and not to any act of the plaintiff. It is also well to recall that the original agreement of October 1, 1932, gave the defendant the exclusive right to sell the plaintiff's paint in Newport, Jamestown, Middletown and Portsmouth, which city and towns constitute the major part of the county of Newport, and that he at that time probably wanted to be in a position to adequately serve this rather extensive territory. Furthermore, the defendant then stocked two stores, one in Newport and one in Jamestown. It is no fault of the plaintiff if the defendant

later had to close his store in Jamestown and to remove the stock of paint from that place to the Newport store.

On July 22, 1933, the defendant gave the plaintiff four notes, one for $1200 and three for $400 each, to cover his overdue account. The $400 notes were payable one, two and three months from date; the $1200 note was payable in monthly instalments after the three other notes were paid. At the time that this arrangement was made, the plaintiff agreed to continue furnishing merchandise to the defendant on open account, and also consented to exchange certain items of paint for the defendant, even though the time for such *exchange* had expired the previous April, according to the terms of the original agreement of November 1, 1932. After the payment of two of the $400 notes, we find the defendant again in default and once more claiming in uncertain language that he had been originally overstocked with paint. Correspondence, telephone calls, and interviews with the plaintiff's representatives resulted in still another adjustment of the defendant's overdue account on December 2, 1933. It is the agreement reached by the parties at this time that gives rise to the instant case.

The testimony in behalf of the plaintiff shows that on that day the plaintiff's duly authorized representative agreed to take back, for credit, paint from the initial shipment amounting to more than $500; that the items to be returned were selected by the defendant himself at that time and a memorandum thereof made by the plaintiff's agent as the selection was thus made; that the plaintiff, through its agent, then surrendered the $1200 note and the remaining $400 note of July 22, 1933, and in return accepted the note for $1800 in suit for the balance of the defendant's overdue account, this note to be paid at the rate of $300 a month; that it agreed to continue selling to the defendant on open account on his promise to pay when such bills

came due; and that it further consented to consider filling an order from the defendant for the spring trade at prices as of December 1, 1933, provided the defendant carried out the promises that he then made. This agreement was confirmed in the plaintiff's letter of December 5, 1933, to the defendant, which also enclosed a copy of the memorandum of the paint to be returned by him.

This last arrangement was barely completed when the defendant again began to complain. In a long letter to the plaintiff, dated December 6, 1933, he states that, according to his understanding of the arrangement, he was left free to pay from $100 to $300 a month on his $1800 note of December 2, 1933, and that his November bill "should go with the total amount which is covered by note." He then goes on to say that he "did not check up the copy of the merchandise to be returned", that he took it "for granted" that it was correct and that he would not pay any handling charges for the return of those goods. As to the spring order, he expresses himself in the following language:

> "The merchandise which is to be returned will amount almost as much as the spring order, therefore, my account will not increase, and *if you want* we can return in addition to the present list of merchandise about $500.00 more, that will cut down our account to a low figure, and it will save worry to us and you, and on that account I promise to pay as much as it will be possible for me to pay." (italics ours)

Near the very end of this letter he says: . . . "after dozens of communications and hours of talk with your representatives, we are still without an agreement." We note here that nowhere in this letter does the defendant say that the plaintiff unconditionally promised to fill his spring order, but merely suggests that the plaintiff take back more paint than was called for by the memorandum which was made in his presence and at his dictation.

The testimony clearly shows that, during the early months of 1934, the defendant continued to buy from the plaintiff on open account, that he allowed even these accounts to become overdue, and that he made no payment of any kind on the $1800 note. In addition to all this, he ignored various communications from the plaintiff calling for payment of his long overdue indebtedness. The result was that the plaintiff's Boston office finally shut off his credit.

On March 3, 1934, we find the defendant complaining to the plaintiff's home office in Detroit, Michigan, about his treatment at the hands of its local office, especially in reference to the refusal of further credit and the failure of the plaintiff to fill his spring order. In a courteous but firm answer from the plaintiff's vice-president and general manager under date of March 6, 1934, the defendant was informed that he would be given every consideration by the plaintiff's executive in the New England section, as the writer had "never known him to take advantage of anyone in a business deal of any kind."

On April 28, 1934, the defendant sent an order for paint to the plaintiff's Boston office with the following statement written in pencil and in a large hand across its face: "Ship at once, please. Enclosed find check for the above. Before May is over we expect to send you a substantial check OR EVEN IN FULL. H. N." The double underscoring in this quotation appears on the order in red pencil. The last letter in evidence from the defendant is dated June 22, 1934, and was sent to the plaintiff's home office in Detroit. It is a mixture of claims, excuses and accusations, together with a threat of "unpleasantness" if his idea of a compromise is not accepted. Yet even in this letter, although the defendant complains that the Boston office will not ship him goods "even when a check comes with the order", he says:

"We cannot pay the note (referring to the $1800 note in suit) unless we sell the paint. If you would not cut off our credit, and ship paint of whatever we are out, we could keep up a trade and gradually settle our bill."

This letter apparently exhausted the plaintiff's patience, for it endorsed the $1800 note in blank and sent it to its attorney in Providence. The attorney then transferred the note for collection to an office associate, the plaintiff Orleck, who instituted this proceeding by writ dated October 24, 1934.

In our examination of the exhibits in the instant case, we were attracted by the difference between the defendant's printed letterheads before the end of July 1933 and those after that date. From December 1932 through July 1933, the material part of the defendant's letterhead reads as follows: "THE NEW GRAIN COMPANY—established 1919—and—THE NEW PAINT STORE. Harry Nemtzow, Prop. Wholesale & Retail." The letterhead after July 1933, which was about the time that the defendant first began to claim that he had been overstocked with paint, makes no mention of "The New Paint Store." This change, taken in connection with all the other circumstances in the case, is reasonably open to the inference that by the end of July 1933 the defendant had decided to withdraw from an apparently unsuccessful venture with the least possible loss to himself.

Having in mind the defendant's special pleas and his contentions thereunder in the superior court and in this court, our examination of the evidence shows that it fairly supports the following conclusions which were apparently reached by both the jury and the trial justice. (1) There was no failure of consideration on the part of the plaintiff when it received the defendant's note for $1800 on December 2, 1933. The surrender by the plaintiff of the $1200

and the $400 notes of July 22, 1933, together with other adjustments made at that time, constituted ample consideration for the note in question. (2) There is no evidence that the plaintiff obtained the $1800 note by false promises and representations. The only charge that possibly could be made against the plaintiff is that it placed too much reliance upon the promises of the defendant. (3) There is no evidence of any collusion between the plaintiff Orleck and the Berry Bros., Inc. to injure the defendant. (4) The defendant's claim that the plaintiff failed to accept all the paint it agreed to receive for credit on December 2, 1933, and his other claim that the plaintiff at that time agreed unconditionally to fill the defendant's order for spring delivery, irrespective of payments by him on his overdue or open accounts, are clearly disproved by the evidence. (5) The plaintiff Orleck is not a *bona fide* holder for value or in due course. This fact, however, has no bearing on the merits of the case as the plaintiff Orleck does not claim to fall in that category. Furthermore, the defendant was allowed to defend the case as fully as if the Berry Bros., Inc. had brought suit in its own name. We will hereafter refer to these five points, which are sufficiently and fairly supported by the evidence, as paragraphs 1 to 5 of the conclusions from the evidence.

The defendant's bill of exceptions consists of forty-four exceptions. Exceptions 3, 6, 8, 9, 11, 12, 13, 27, 34, 35, 36 and 43, twelve in all, are specifically waived by him; twenty-four concern rulings in the course of the trial; one is to the denial of his motion for a directed verdict; six are to the charge of the court; and one is to the refusal of the trial justice to grant him a new trial. Twenty of the twenty-four exceptions to rulings during the trial, identified as exceptions 4, 5, 10, 14 to 22 both inclusive, 25, 28 to 33 both inclusive, and 37, are without merit as they relate to questions improper in form, or to questions that call for a repe-

tition of testimony, or to questions that are directed to immaterial and irrelevant matters. The other four exceptions in this group, that is, exceptions 7, 23, 24 and 26, refer to certain writings which were offered in evidence by the defendant but were excluded by the court. These proposed exhibits were not marked for identification nor did the defendant make any offer of proof of their contents. There is nothing before us to show what these writings contained. Without such knowledge we cannot review the action of the trial court. *LaFrance* v. *Moquin*, 49 R. I. 151. These twenty-four exceptions are overruled.

The defendant's exception, number 1, to the denial of his motion for a directed verdict is based on two grounds: First, that the note in suit is without consideration; and second, that the plaintiff Orleck, as an assignee of the note, should have instituted the suit in the name of his assignor. We cannot agree with either of these contentions. The former is denied by paragraph 1 of the conclusions from the evidence, and the latter is in conflict with the law of negotiable instruments as consistently applied by this court. A person in possession of a note indorsed in blank is *prima facie* the holder of that note and may sue upon it in his own name until his right to do so is disproved. It is no defense to an action on such paper merely to say that the property in it is in another and not in the plaintiff, if the maker is not thereby prejudiced in his defense. This is especially true if the suit is brought at the request or with the consent of the owner of the note and for his benefit. The defendant cannot question the plaintiff's title, except on the ground of bad faith in the plaintiff or prejudice to the defendant's rights. 8 C. J. 822, §§ 1084 (b), 1087, 1095. *Bank of America* v. *Senior*, 11 R. I. 376; *Mumford* v. *Weaver*, 18 R. I. 801; *Cross* v. *Brown, Steese & Clarke*, 19 R. I. 220, 239; *Hutchings* v. *Reinhalter*, 23 R. I. 518. In the instant case there is no evidence of any improper conduct, such as fraud, duress, or the like, on the part of the plaintiff, and,

as we have already stated, the defendant was not, in any way, prejudiced in his defense.

The defendant further argues that even if the attorney to whom the plaintiff sent the note in suit for collection could sue in his own name, it does not follow that he could delegate this right to his office associate. In view of what we have just said, we fail to see the pertinency of this argument. Having come into possession lawfully of the note indorsed in blank by the plaintiff and having acted throughout in good faith for its benefit, the plaintiff Orleck had the same right to bring this action in his own name as the attorney himself.

The defendant argues that the decision of this court in *Blaine* v. *Bourne,* 11 R. I. 119, is an authority in his favor on the point that we have just discussed and confronts us in his brief with an alleged quotation from that opinion in support of his claim. The *Blaine* case is clearly not in point and the language as quoted is not to be found in the opinion. With considerable difficulty we discovered that the alleged quotation was a combination of disconnected phrases from widely separated parts of that opinion, without indicating intervening omissions. As this may have been due to oversight in revision, we now say that it is the duty of counsel in every case to make certain that quotations from the decisions of this or any other court are truly and fairly presented and do not misrepresent the meaning of the language used by the court. The defendant's exception to the denial of his motion for a directed verdict is overruled.

We now come to the defendant's six exceptions to the charge of the court. Exception thirty-eight concerns a preliminary remark by the trial justice as to the importance of the plaintiff's letter of October 1, 1932, which confirmed in writing the agreement between the parties. We find nothing prejudicial to the defendant in this statement, especially since all matters in connection therewith and sub-

sequent thereto were fully and fairly submitted to the jury for their determination. Exceptions thirty-nine, forty-one and forty-two bring up for review the propriety of instructing the jury that there was no evidence to support the following contentions urged by the defendant: failure by the plaintiff to accept all the paint it had agreed to receive for credit; failure by the plaintiff to ship a spring order to the defendant; and fraud or deceit on the part of the plaintiff. The instructions of the court as given are in entire accord with the foregoing paragraphs 2, 3 and 4 of the conclusions from the evidence. Exception forty is directed to a statement by the trial justice to the effect that if the jury should find from the evidence that the defendant had expended more than $162.90 for advertising the plaintiff's goods in accordance with the contract, they should allow the defendant the difference between the amount so found by them and $162.90, as the defendant had already been credited with $162.90 by the plaintiff on that item. This statement is amply supported by the evidence. Exception forty-four refers to that part of the charge in which the court instructs the jury to find for the plaintiff in a sum not less than $1600. From our review of the evidence, including a computation of all credits to which the defendant was reasonably entitled thereunder, we are convinced that this instruction was correct. These six exceptions to the charge are overruled.

The defendant's only other exception, exception 2, is to the denial of his motion for a new trial. The clearly conflicting testimony in the case presented various issues of fact, which, according to our examination of the record before us, were all properly and justly decided in favor of the plaintiff by both the jury and the court. Under our well-known rule applicable in such cases we find no cause to disturb the decision of the trial justice. This exception is overruled.

Many of the exceptions in the instant case remind us of a statement respecting exceptions in *State* v. *Smith,* 35 R.

I. 285. It is unnecessary for us to repeat here what this court said at page 290 of that opinion in reference to frivolous exceptions.

All of the defendant's exceptions are overruled and the case is remitted to the superior court for the entry of judgment on the verdict.

*Max Winograd, William J. Carlos,* for plaintiff.
*Max Levy,* for defendant.

